IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

TEON RICHARDSON,

             Defendant.

CRIMINAL CASE NO.

1:14-CR-00459-LMM-JFK

## <u>REPORT AND RECOMMENDATION</u>

Pending  before the court is Defendant Teon Richardson's motion [Doc. 13] to suppress evidence, that is, a firearm and ammunition seized on March 7, 2014, from a jacket he had been wearing and other items seized from the vehicle he had been driving.  Defendant also filed a motion [Doc. 14] to suppress statements that he made on that date regarding a credit card skimmer found in the vehicle.  An evidentiary hearing was held on the motions to suppress on August 27, 2015.  [Doc. 34].[1]  The Government does not intend to introduce into evidence any items seized from the search of the vehicle, including a credit card skimmer and a cellular telephone, or any statements made by Defendant, including regarding that credit card skimmer, at trial.

---

[1]Citations to the evidentiary hearing are:  (Tr. at ).

(Tr. at 15-16).  Accordingly, because the motions to suppress Defendant's statements and the items seized from the vehicle are moot, the court will not further address the statements or the seizure of the items from the vehicle.

Defendant is charged with being a felon in possession of the firearm seized on March 7, 2014.  [Doc. 1].  Defendant contends that law enforcement officers who conducted the stop and detention and then seized the firearm lacked probable cause and exigent circumstances for the warrantless search of his jacket or a reasonable suspicion that Defendant posed a danger in order to conduct a pat down or frisk of Defendant and the jacket.   [Doc. 37].   The Government does not respond to Defendant's arguments,[2] instead, contends that the seizure of the firearm and ammunition was the result of a voluntary consent to search Defendant's person.  [Doc. 39].  In reply, Defendant contends that he did not consent to a search of his person at all, only a search of his vehicle, and that the search of his person and the jacket exceeded the scope of the consent to search his vehicle.  [Doc. 40].  Defendant does

_____

[2]Although the Government makes a conclusory statement that the officer "had reasonable suspicion" presumably to conduct a pat down, no argument is presented supporting that statement establishing that the warrantless search was justified on this ground.  [Doc. 39 at 2].  As noted *infra*, the Government bears the burden justifying a warrantless search, and it has failed to do so on this ground which will not be further addressed herein.

not further address whether, if the evidence establishes that he consented to a search of his person, that a search of the jacket fell within the scope of that consent.  [Id.].

## I.    Background Facts

The following facts are pertinent to the issue of Defendant's consent to search his person and the resulting seizure of the firearm from his jacket.  On March 7, 2014, Atlanta Police Officers Williams and Kitchen were on patrol in a marked police vehicle and observed Defendant Teon Richardson operating a vehicle after dark without headlights.[3]  (Tr. at 3-5, 18, 30).  Defendant was traveling northbound on Parkway Drive, and the officers were traveling southbound.  The officers turned around to follow Defendant and activated their blue lights to conduct a traffic stop. (Tr. at 5-6, 16, 19).  Defendant pulled into a hotel parking lot at 585 Parkway Drive, and the officers pulled up behind him.  (Tr. at 6, 16).  Defendant exited his vehicle, and Officer Williams exited the patrol vehicle and, for safety reasons, directed Defendant to get back into his vehicle.  (Tr. at 6, 21).  Defendant did not immediately comply but shouted out that "he knew why [the officer] was pulling him over, that his headlights weren't working, and that he could fix them."  (Tr. at 7, 21-22).  When the

---

[3]The officers did not observe any other violations regarding Defendant's operation of the vehicle.  (Tr. at 19).

3

officer instructed Defendant to get into the vehicle a second time, Defendant complied.[4]  (Tr. at 7, 23).

The officer, in uniform with his firearm holstered, approached the driver's side door and spoke to Defendant through the open window asking for Defendant's driver's license.  He detected the odor of alcohol and observed an open box of Mangoritas, an alcoholic beverage.  (Tr. at 7-8, 25-27, 30).  In reply to a question whether he had been drinking, Defendant stated that he had been drinking that night.  (Tr. at 8).  Defendant, although experiencing difficulty due to the fact that his hands were shaking, eventually found and provided his driver's license.[5]  (Tr. at 8, 23-25).  The officer asked if there was anything illegal in the vehicle, and Defendant stated no and that the officer "could search the vehicle."  (Tr. at 8-9, 27).  The officer asked Defendant to exit the vehicle and to step to the rear of the vehicle.  Defendant complied.  (Tr. at 9-10, 28).  As Defendant exited the vehicle, the officer observed an open can of Mangorita in the center console.  (Tr. at 9).

---

[4]Defendant did not act or speak aggressively towards or threaten the officers. (Tr. at 22).

[5]The officer testified that the amount of Defendant's shaking and his stuttering were more intense than he observes during a normal traffic stop.  (Tr. at 25).

4

When Defendant reached the rear of his vehicle, without a request from the officer, Defendant began to empty items from his pockets onto the trunk and then he removed his leather jacket and placed it on the trunk.  (Tr. at 10, 29).  On direct, Officer Williams testified as follows:

Q:    Did you ask him if you could search his person?

A.    I did.

Q:    What was his response?

A:    Yes.

On cross-examination, the officer described this exchange with Defendant by adding that he also asked Defendant if he had anything illegal on his person.  (Tr. at 29). Officer Williams testified that after Defendant placed his jacket on the trunk of the vehicle:

Q:    Is the next thing that happens at that point is that you ask him whether you could search his person?

A:    Right, and I asked him does he have anything illegal on his person, as well.

Q:    Did you ask him if you could search, or is - -

A:    No, No, I didn't ask him if I could search, no.  He emptied out the contents of his pockets on his own, and after he did that, I asked him well do you have anything illegal on you.  He said no.

Q:     Okay.  And so then did you proceed to pat down his person?

A:     Yes.

(Tr. at 29-30).

The jacket remained on the trunk within arm's reach of Defendant during the pat down which produced nothing of interest.  (Tr. at 10, 30, 38).  At that point, Officer Williams "laid [his] hand on the jacket . . . and . . . [felt] the gun inside the jacket."[6]  He did not manipulate the jacket in any manner but, based on his experience with firearms, felt the shape of the gun instantly.  (Tr. at 11, 30-32).  Officer Williams signaled that he found a firearm to Officer Kitchen and proceeded to attempt to handcuff Defendant for safety reasons.  (Tr. at 11-12, 32-33).  Instead, Defendant attempted to flee, and both officers - after a brief struggle with Defendant - subdued and handcuffed him.  (Tr. at 11, 33).  After Defendant was secured, the officers removed the firearm from the jacket.  (Tr. at 34).  When Defendant's driver's license was "run" (that is, a computer check of criminal records), the officers determined that Defendant was a convicted felon.  (Tr. at 12-13).

---

[6]The officer did not ask for permission to search Defendant's jacket.  (Tr. at 31). The officer testified that Defendant removing his jacket was a "red flag" and that he "touched the jacket simply because I was under the impression there might have been something illegal in the jacket."  (Tr. at 36-37).

6

Additional facts will be set forth as necessary during discussion of Defendant's motion to suppress the firearm and ammunition.

## II.    Discussion

The Government contends that the search of the jacket and the seizure of the firearm found therein was the result of a voluntary consent to search Defendant's person and that the search of that jacket fell within the scope of Defendant's consent. [Doc. 39].  In response, Defendant argues that the Government did not establish that he consented to a search of his person, only his vehicle, and that the search of his person and the jacket fell outside the scope of the vehicle consent search.  [Doc. 40]. The court finds that Defendant's argument misconstrues Officer Williams' testimony at the suppression hearing.  [Id. at 4-5].  The court having heard the entire testimony of the officer and considering the context of the statement made by the officer relied on by Defendant[7] to argue consent was not obtained finds that the officer did ask Defendant if he could search his person, that Defendant consented to the search of his person and that the search of the jacket fell within the scope of the consent search.

---

[7]"No, No, I didn't ask him if I could search, No."  [Doc. 40 at 5 (quoting Tr. at 29)].

"It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search an individual without a warrant so long as they first obtain the voluntary consent of the individual in question." United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) (citing Schneckloth v. Bustamonte, 93 S. Ct. 2041 (1973)); accord United States v. DeJesus, 435 Fed. Appx. 895, 901 (11th Cir. 2011) (same). "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." Id. at 798 (citing Schneckloth, 93 S. Ct. at 2059); see also United States v. Nuyens, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances."). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Blake, 888 F.2d at 798 (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)); see also United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).

As the Eleventh Circuit Court of Appeals affirmed in United States v. Acosta, 363 F.3d 1141 (11th Cir. 2004), "determining whether consent was 'voluntary is not

8

susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis.'" Id. at 1151 (quoting Blake, 888 F.2d at 798).  In conducting this case-by-case analysis, factors considered by courts in assessing voluntariness include, but are not limited to:  "voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found."  Blake, 888 F.2d at 798 (citations and internal quotation marks omitted); see also Purcell, 236 F.3d at 1281 (same).

However, "the government need not establish [a defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of an effective consent.'"  United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 117 S. Ct. 417, 421 (1996)); accord United States v. Brown, 223 Fed. Appx. 875, 880 (11th Cir. 2007) ("the government is not required to prove that the defendant knew he had the right to refuse to consent, and a defendant's lack of knowledge of this right is not dispositive, but is just one factor to consider in evaluating the totality of the circumstances"); United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2005)

("To the extent Pineiro suggests that the police were required to be more specific in advising him of his rights, and were required to tell him he had a right to refuse consent, this Court has squarely rejected this argument.").  And, contrasting the test for the waiver of "rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment[,]" Schneckloth, 93 S. Ct. at 2055, the Supreme Court explained that, while a consent to search must be voluntary, it need not be "'an intentional relinquishment or abandonment of a known right or privilege[,]'" that is, knowing and intelligent.  Id. at 2055-56 (citation omitted); see also Tukes v. Dugger, 911 F.2d 508, 516 (11th Cir. 1990) (same).  "'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.'"  United States v. Alim, 256 Fed. Appx. 236, 239 (11th Cir. 2007) (quoting United States v. Jones, 475 F.2d 723, 730 (5th Cir. 1973)).

First, the court finds that Officer Williams did ask Defendant if he would consent to a search of his person.  The evidence, as found by the court after viewing Officer Williams' testimony,[8] establishes the following events and exchange between

---

[8] "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-

10

the officer and the Defendant.  After Defendant denied having anything illegal in the car and offered to allow Officer Williams to search the vehicle, at the officer's request, Defendant stepped out of and to the rear of his vehicle.  (Tr. at 8-9, 27-28).  Then, without being asked to do so, Defendant emptied his pockets and removed his jacket, lying everything on the trunk of the vehicle.  (Tr. at 10, 29).  At that point, the officer asked Defendant two questions.  He asked Defendant if he had anything illegal on his person, and when Defendant responded, no, asked if he could search Defendant's person.  Defendant responded, yes.  (Tr. at 10, 29-30).

The single statement by the officer that he did not ask Defendant for consent to search should not be taken out of the context of the officer's entire testimony.  Officer Williams affirmed not only on direct but on also on cross-examination that he asked

---

Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  In weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand."  Id. at 750; see also United States v. Wein, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand").  And, unless the evidence "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" or unless the factfinder's determinations appear to be "'unbelievable[,]'" a reviewing court should accept those findings of fact.  Ramirez-Chilel, 289 F.3d at 749 (citations omitted); accord United States v. Griffith, 397 Fed. Appx. 613, 617-18 (11th Cir. 2010).

11

Defendant for consent to search his person.  (Tr. at 10, 29).  Any confusion is caused in part by the fact that the officer did not ask Defendant to remove the items from his person but that "[h]e emptied out the contents of his pockets on his own . . . ." (Tr. at 29).  This explanation as to how the items came to be on the trunk of the vehicle follows the statement that the officer did not ask Defendant if he could search which the court finds was an attempt to clarify the circumstance of Defendant emptying his pockets. (Tr. at 29).  And after providing that explanation, the officer further clarifies that before asking Defendant if he could search is person, he asked Defendant if there was "anything illegal on [him] . . . ." (Tr. at 29).  That is the end of the officer's statement. (Tr. at 29-30).  Simply because the officer, in response to the *next* question on cross-examination ("And so then did you proceed to pat down his person?"), did not add to his affirmative response ("Yes.") that he asked for consent to search does not negate the earlier, repeated testimony that consent was asked for and received. (Tr. at 29-30).  The court finds that the Government established that Defendant consented to a search of his person.  See Blake, 888 F.2d at 798 ("The government bears the burden of proving . . . the existence of consent . . . .").

Second, the court finds "that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Id.

AO 72A
(Rev.8/82)

Defendant, who was not in custody during the traffic stop, was cooperative throughout the interaction with the two officers, at least prior to the discovery of the firearm. He immediately pulled over in response to the blue lights (Tr. at 6, 19); he acknowledged knowing why the officers stopped him, that is, the vehicle's headlights being out (Tr. at 7, 22); without being asked, he offered to allow a search of his vehicle (Tr. at 8-9, 27); he exited and moved to the rear of his vehicle when asked (Tr. at 9, 28); and, without being asked, he removed items from his pockets and removed his jacket and placed those items, along with the jacket, on the trunk of the vehicle (Tr. at 10, 29). There is no indication in the testimony that the officers threatened Defendant or coerced him to obtain his consent to search his person. And, in addition to receiving Defendant's verbal consent for the search, the court finds that by removing items from his person without being asked, Defendant appeared to be inviting the officer to pat down his person and belongings to check for contraband. Cf. United States v. Chrispin, 181 Fed. Appx. 935, 939 (11th Cir. 2006) (noting that the court had "previously found a search consensual where no verbal consent was given, but the defendant's body language indicated his assent to the search.") (citing Ramirez-Chilel, 289 F.3d at 752).

13

Officer Williams then conducted the pat down of Defendant's person and found no contraband or weapons.  (Tr. at 10-11, 30-31).  At that point, without specifically seeking consent to search Defendant's jacket lying within reach of Defendant on the trunk (Tr. at 10, 30-31, 38), Officer Williams "laid [his] hand on the jacket . . . and . . . [felt] the gun inside the jacket."  He did not manipulate the jacket in any manner but, based on his experience with firearms, felt the shape of the gun instantly.  (Tr. at 11, 30-32).  Although not discussed by Defendant in the context of the consent to search his person, the next question for the court to answer is whether the pat down of the jacket fell within the scope of that consent.

With respect to the issue of exceeding the scope of a consent to search, in Zapata, 180 F.3d at 1242, the Eleventh Circuit Court of Appeals stated:  "We have said that a search is impermissible when an officer does not conform to the limitations imposed by the person giving consent."  Accord DeJesus, 435 Fed. Appx. at 902 ("'A consensual search is manifestly reasonable so long as it remains within the scope of the consent.'") (citation omitted).  And, "[w]hen an individual provides a general consent to search, without expressly limiting the terms of his consent, the search 'is constrained by the bounds of reasonableness:  what a police officer could reasonably interpret the consent to encompass.'" Zapata, 180 F.3d at 1242 (quoting United States

14

v. Strickland, 902 F.2d 937, 941 (11th Cir. 1990)); accord DeJesus, 435 Fed Appx. at

902; United States v. Street, 472 F.3d 1298, 1308 (11th Cir. 2006).  In this regard, in

Florida v. Jimeno, 111 S. Ct. 1801 (1991), the Supreme Court stated, "The standard

for measuring the scope of a suspect's consent under the Fourth Amendment is that

of 'objective' reasonableness–what would the typical reasonable person have

understood by the exchange between the officer and the suspect?"  Id. at 1803-04;

accord Street, 472 F.3d at 1309.  "To ascertain what conduct is within the 'bounds of

reasonableness," [a court] must consider what the parties knew to be the object (or

objects) of the search. . . .   A general consent to search for specific items includes

consent to search any compartment or container that might reasonably contain those

items." Zapata, 180 F.3d at 1243; see also Jimeno, 111 S. Ct. at 1804 ("The scope of

a search is generally defined by its expressed object.").  The scope of the consent to

search is "to be determined by the totality of the circumstances."  Blake, 888 F.2d at

798.

        Defendant did not restrict the consent search of his person which, based on the

officer's question preceding the consent to search, that is, whether Defendant had

anything illegal on his person, would have been objectively understood to allow a

15

search for any type of contraband, including weapons.[9]  Additionally, in consenting to a search of one's person, "a reasonable person would have understood the scope of consent to at least include the pockets of [the defendant's] outer clothing."  United States v. Lisbon, 2014 WL 3672887, at *5 (D. Md. Ga. July 22, 2014) (citing United States v. Stinson, 468 Fed. Appx. 285, 288 (4th Cir. 2012) ("reasonable person would have understood that the scope of defendant's consent to a search of his 'person' included both a pat-down for weapons and a search of defendant's pockets")); and see United States v. Dinwiddie, 2008 WL 4922000, at *19 (E.D. Mo. January 29, 2008) ("a reasonable person, after consenting to a search, would have understood that the officers would search his pockets").  And Officer Williams, given the facts that Defendant had been wearing the jacket and removed the jacket and laid it on the trunk of his vehicle within arm's reach - as he did with other items he removed from his person, would have reasonably understood that Defendant's consent extended to that jacket.  See Zapata, 180 F.3d at 1242 (consent to conduct a general "search 'is constrained by the bounds of reasonableness:  what a police officer could reasonably interpret the consent to encompass'") (citation omitted).  Placing all of the items from

---

[9]The officer testified that Defendant removing his jacket was a "red flag" and that he "touched the jacket simply because I was under the impression there might have been something illegal in the jacket."  (Tr. at 36-37).

16

his person, including the jacket, on the trunk, in plain and public view, was reasonably construed as an invitation to inspect those items as a part of the search of Defendant's person.  And Defendant did not object to the officer touching the jacket which further supports a finding that Defendant's consent extended to the jacket.  See United States v. Garcia, 284 Fed. Appx. 791, 795 (11th Cir. 2008) (the defendant did not place any limitations on his consent to search his vehicle and did not object when the officers began searching the engine); United States v. Harris, 928 F.2d 1113, 1117-18 (11th Cir. 1991) (the defendant "was physically present while [the officer] searched the car, and had ample opportunity to limit the scope of the search, or request that it be discontinued"); United States v. Degaule, 797 F. Supp. 2d 1332, 1376 (N.D. Ga. 2011) ("If [the defendant] intended the scope of his consent to be limited, he had ample opportunity to object or clarify, especially in light of the cordial, even friendly, tone of communications he had with the agents before and during the search.").  If Defendant intended to limit the scope of his consent to search his person to exclude the jacket by removing it and placing it on the trunk, he was required to verbalize that intent; his subjective intentions do not control.  See Jimeno, 111 S. Ct. at 1803-04 (applying an objective standard to determine the scope of a consent search); Zapata, 180 F.3d at 1242 (requiring express limitations on a search).

17

Finally, Officer Williams simply laid his hand on the jacket - he did not manipulate the jacket in any manner. (Tr. at 11, 31-32). He immediately determined that the shape he felt was a firearm. (Tr. at 11, 31). Once Defendant was secured, the officers lawfully seized that firearm from the jacket. (Tr. at 33-34). "The Supreme Court has made clear that '[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons.'" Chrispin, 181 Fed. Appx. at 939 (quoting Minnesota v. Dickerson, 113 S. Ct. 2130, 2137 (1993)) (applying the Supreme Court's reasoning to the officer feeling an item that he thought was a weapon during the consent search of the defendant's person and then retrieving the item).

Accordingly, the court finds that Defendant voluntarily consented to a search of his person and that the search of the jacket fell within the scope of the consent.

## III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 13] to suppress evidence, the firearm seized from his jacket, be **DENIED** and that in all other respects Defendant's motion [Doc. 13] to suppress evidence and motion [Doc. 14] to suppress statements be **DENIED** as **MOOT**.

18

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED AND ORDERED** this 1st day of December, 2015.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

19